# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON

Assigned on Briefs November 6, 2007

## COURTNEY PERRY v. STATE OF TENNESSEE

**Appeal from the Criminal Court of Tennessee for Shelby County**
**No. P-28082    W. Otis Higgs, Judge**

---

**No. W2006-01852-CCA-R3-PC  - Filed February 5, 2008**

---

The petitioner, Courtney Perry, sought post-conviction relief from his conviction of felony murder and especially aggravated robbery.  The Shelby County Criminal Court denied relief after an evidentiary hearing.  On appeal, the petitioner argues he received ineffective assistance of counsel because trial counsel failed to raise a proper defense of duress and failed to address why the petitioner was present at the murder scene.  We affirm the denial of post-conviction relief.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined.  J.C. MCLIN, J., not participating.

John H. Parker II, Memphis Tennessee, for the appellant, Courtney Perry.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; and Patience Branham, Assistant District Attorney General; for the appellee, State of Tennessee.

### OPINION

We begin with a summary of the factual background of the petitioner's conviction, which we gleaned from a trial transcript that was exhibited to the post-conviction hearing.

On the morning of April 10, 2001, the body of the victim, O'Neal Cornish, was discovered in the Whitehaven section of Memphis.  Percy McCray Alexander, a retired battalion chief with the Memphis Police Department, testified at the petitioner's trial that at approximately 7:15 a.m., he was driving in his neighborhood searching for his lost dog.  Mr. Alexander drove down Kilarney Avenue to a dead end street.  There, he noticed some dogs running towards the woods and clothes that had been discarded or dumped in a cove.  He looked down the cove and saw a pair of tennis shoes in an odd position, leading him to believe that a homeless or drunk person had passed out.  Mr. Alexander decided to take a closer look and drove down the cove.  When he realized that there was indeed a man lying in the area, Mr. Alexander blew his car horn to see if he could rouse

the man. When that failed, Mr. Alexander got out of his vehicle and noticed "a stream of blood that appeared to be coming from the body." Mr. Alexander called police, reported that he had found a dead body, and stayed with the body until police arrived.

Sergeant Eric Freeman, a crime scene investigator with the Memphis Police Department, testified at trial that at around 8:30 a.m. on April 10, 2001, he was called to a "DOA unknown" crime scene near Shepherd's Tree Street and Kilarney Avenue. He stated that the area was being developed for houses but they had not been built yet. Sergeant Freeman testified that upon arrival "we saw a little young male black who had been shot was lying out in the middle of the street."

Sergeant Freeman and another crime scene investigator discovered four .380 caliber shell casings on the ground above the victim's head. They also discovered several shell casings that appeared to have been there for some time. Near the body, police found tobacco from a broken cigar or cigarette, bloody tissue paper, a sales receipt, a bullet fragment, a tile cutting wheel, and a Waffle House identification card bearing the name "Jennifer." Twenty-five dollars in cash was found in the victim's right sock.

Doctor O'Brian Cleary Smith, the Shelby County Medical Examiner, testified that he performed the autopsy on the victim. He determined that the victim died as the result of multiple gunshot wounds. The victim had five entrance wounds on his body and one exit wound. He identified the wounds as A, B, C, D, E and F. Gunshot wounds A and B were contact wounds to the victim's head. The bullets traveled from the right side of the victim's head through the brain and rested near his left jaw. Bleeding in the path of gunshot wounds A and B indicated that the victim was alive when those wounds were inflicted. Gunshot wounds C and D passed through the victim's chest and were found in his spinal cord. The bullet for gunshot wound E exited the body through wound F and was not recovered. Doctor Smith stated that gunshot wounds C, D, and E had no blood in the wound path, indicating that the victim was dead when those wounds were inflicted.

Seku Teamer testified at trial that he was the best friend of the victim, O'Neal Cornish. At the time of the victim's death, Mr. Teamer was living with the victim. Around 9:00 p.m. on April 9, 2001, the victim and Mr. Teamer went to Wing City, a nightclub and restaurant that served as "kind of a nightclub spot." The victim drove Mr. Teamer to Wing City in the victim's "money marble green" Blazer. The men stayed at the nightclub talking until around 2:00 a.m. Mr. Teamer testified that he was drinking cognac, but he could not recall if the victim was drinking that evening. Fifteen minutes before they left, the victim received a call on his cellular telephone. Mr. Teamer heard a male voice on the other end of the conversation, but he could not identify the voice. The victim told Teamer that he was speaking with Tyree Robinson. Teamer said that they were talking about "[g]etting up with the female and going to get a hotel room . . . . I guess they were begging him to having [sic] sex with her because that's all he was talking about." Mr. Teamer testified that the victim and the individual with whom he was speaking with made arrangements to meet at the Loft Apartments. The victim drove Mr. Teamer home, and on their way the victim received another phone call to confirm he was still coming to the Loft Apartments. Mr. Teamer

testified that the victim told him this phone call was also from Tyree Robinson. After dropping off Mr. Teamer, the victim left for the Loft Apartments.

Takisha Brown testified that at the time of the victim's death she was dating Corey Perry, the petitioner's brother.[1] At that time, Corey was living with the petitioner, Tyree Robinson, Ilyas Morris, Miko Saulsberry, and others in the petitioner's apartment at the Loft Apartments.[2] Ms. Brown testified that earlier in the evening of April 9, 2001, she attended a movie with friends. At approximately midnight she returned to the petitioner's apartment. The petitioner, his brother, Mr. Morris, Mr. Robinson, and Mr. Saulsberry were there.

Ms. Brown testified that she went into the petitioner's bedroom to speak with him and Mr. Robinson. When she entered the room, Mr. Robinson was talking with the petitioner about robbing the victim. Ms. Brown testified that up to that point she did not know the victim. The petitioner told Ms. Brown that the victim was coming to the apartment to pick him up and that he wanted her to go along with what he had already discussed with the victim. Specifically, Ms. Brown said that Mr. Robinson wanted her to tell the victim that she would have sexual intercourse with him. Ms. Brown testified that Mr. Robinson wanted her to agree to have sex with the victim so that the petitioner could rob him. Ms. Brown spoke briefly with the victim on the telephone and told him that she would go with him and Mr. Robinson. She explained that she was the "bait" to entice the victim to come to the apartment. Ms. Brown believed that Mr. Robinson wanted to rob the victim because he needed money to pay the rent and avoid eviction from the apartment.

When the victim arrived, Ms. Brown, Mr. Robinson, and the petitioner got into the victim's dark green truck. The victim was driving, the petitioner was in the front passenger seat, Mr. Robinson was sitting behind the victim, and Ms. Brown was sitting behind the petitioner. The victim drove to a gas station to buy cigars so they could smoke marijuana.

After getting the cigars, the victim drove to a secluded area in Whitehaven that "was dark, and it was just grass." Ms. Brown testified that everyone in the car smoked marijuana for about 30 minutes. After they smoked the marijuana, the victim pulled a pistol from his glove compartment. Ms. Brown said that the victim and Mr. Robinson discussed "how .380's jammed up and everything." The victim asked Mr. Robinson if he had a gun. Mr. Robinson denied having a gun but then admitted that he was "just playing" and pulled out a gun. Ms. Brown then heard a gun go off twice. She testified that Mr. Robinson opened the driver's door, and the victim fell out of the vehicle. They left the victim's body, and Mr. Robinson drove the group to the Club on the Green Apartments.

Ms. Brown testified that when they arrived at the Club on the Green Apartments, Mr. Morris and Mr. Saulsberry were waiting for them in Mr. Morris' Astro van. At Mr. Robinson's

---

[1]Ms. Brown is referred to variably as "Takeisha," Keisha," and "Takisha" throughout the case documents.

[2]Mr. Saulsberry is referred to as both "Miko" and "Mieko" in the case documents.

instruction, Ms. Brown and the petitioner got out of the victim's vehicle, Ms. Brown got into the back seat of Mr. Morris' van, and the four men put on plastic gloves and went through the victim's vehicle. Mr. Robinson stepped outside the van and removed his clothes, which were covered with blood. Ms. Brown testified that she believed the bloody clothes were placed in the victim's truck. After ten or fifteen minutes, they left in Mr. Morris' van and returned to the location of the victim's body. When they arrived at the body, the petitioner leaned out of the van, intending to shoot the victim again to ensure that he was dead. However, Mr. Robinson's pistol jammed, so "[h]e gave Courtney [sic] O'Neil's gun and told him to get out and shoot him." Ms. Brown said that the petitioner hesitated but left the car and shot the victim two or three times. Afterward, they went back to the Loft Apartments.

After returning to the apartment, Mr. Robinson changed clothes and left with the petitioner, Mr. Saulsberry, and Mr. Morris. Ms. Brown testified that she stayed at the apartment with her boyfriend and told him what had happened. Later, when the men returned after "some minutes," Ms. Brown heard Mr. Saulsberry screaming that he had been burned. She testified that she never saw the victim's car again.

Ms. Brown admitted that she had been arrested and charged with facilitation of first degree murder due to her role in the victim's death. She said that she had not entered into any deal with the State and that she had been instructed by the State only to tell the truth.

On cross examination, Ms. Brown testified that Mr. Robinson did all the talking that evening regarding the plan to rob the victim. She stated that the petitioner never said anything. Ms. Brown testified that she thought the plan was for her and Mr. Robinson to go out with the victim, but then the petitioner came along. When asked if she knew why the petitioner might have joined them she stated, "I assume it was… so there was nothing happening to me."

When asked about the petitioner's shooting of the victim, Ms. Brown testified that the petitioner hesitated to shoot the victim,

> Q: Was he [Mr. Robinson] looking at him like he was going to do something to him or was he just looking at him like he was afraid or something?
>
> A: No. He was looking crazy . . . .
>
> Q: What do you mean looking crazy? What do you mean? - Explain it to me.
>
> A: I mean it was like he would have did something if he didn't do it.
>
> Q: In other words, you think he would have done something to Mr. Perry had he not done it?

A: Yes, sir.

Ms. Brown testified that she did not go home that evening. She stayed at the Loft Apartments for "three or four" days after that evening. Ms. Brown testified that she did not feel threatened or forced to stay at the apartment, but Mr. Robinson was watching everything going on.

Ilyas Morris testified that in April 2001, he was living at the petitioner's apartment. At the time, Mr. Morris had a 1991 Chevrolet Astro van. On April 10, 2001, around midnight, Morris was downstairs trying to sleep, and he heard the petitioner, Mr. Robinson, and Ms. Brown talking in the petitioner's room upstairs. Mr. Morris testified that he heard them talking about "mostly just robbing somebody," but "[t]hey had the door closed, so I really just couldn't hear," the details of the conversation. Mr. Morris went to sleep and was awakened some time later by Mr. Saulsberry. Mr. Saulsberry told Mr. Morris that Mr. Robinson wanted them to go to the Club on the Green Apartments. Mr. Morris said that he did not know why they were going to the apartments.

Mr. Morris testified that he drove Mr. Saulsberry to the Club on the Green Apartments. They waited in the parking lot for a period of time. Mr. Morris testified that he "nodded off a couple of times" and was "fixin' to leave" the apartment complex. As they were leaving, Mr. Morris saw a vehicle coming down the street with its lights flashing. Mr. Morris slowed down and saw that Mr. Robinson was driving a Blazer. When Mr. Robinson flashed the lights, Mr. Morris turned around and drove back into the apartments. Mr. Robinson then got out of the vehicle, removed his clothes, and got into Mr. Morris' van. The petitioner and Ms. Brown then exited the Blazer. Mr. Morris went over to the Blazer, saw a VCR and remote control inside, and proceeded to take it from the Blazer and put it in his van. Mr. Morris testified that he took the VCR because he "just wanted it."

Mr. Morris testified that the petitioner, Mr. Saulsberry, Mr. Robinson, and Ms. Brown got into his van and that Morris drove them back to the location of the victim because "Tyree wanted to make sure he was dead." When they got to the location of the victim's body, Mr. Robinson told the petitioner to get out of the van and shoot the victim again. Mr. Morris testified that the petitioner complied, taking a gun from Mr. Robinson and shooting the victim "two or three" times with the victim's own weapon. Morris testified that he knew that Mr. Robinson had a .380 silver pistol that did not have a safety on it. The petitioner used another .380 pistol to shoot the victim. Mr. Morris testified that the pistol used by the petitioner was smaller than Mr. Robinson's pistol.

Mr. Morris testified that after the petitioner shot the victim again they returned to the Loft Apartments. Ms. Brown separated from the group, and Mr. Morris, Mr. Robinson, Mr. Saulsberry, and the petitioner remained together. Mr. Robinson used the victim's cellular telephone to call around looking for a floor jack to remove the rims from the victim's truck. Despite their efforts, they were unable to find a floor jack.

Mr. Morris testified that they then bought some gasoline from a Circle K gas station to burn the Blazer. They put the gasoline in a "jungle juice" jug and a two-liter Sprite bottle. They

returned to the Blazer and Mr. Robinson and the petitioner poured the gasoline on the inside of the truck. Mr. Saulsberry was throwing matches into the truck to ignite the gasoline when "the flames jumped back and burnt him." After burning the Blazer, they went back to the Loft Apartments, and Mr. Saulsberry took a bath to help with his wounds.

Mr. Morris testified that about a week later he heard from Mr. Robinson and the petitioner again. They had been picked up by the police for questioning about how Mr. Saulsberry obtained his burns. Mr. Robinson asked him to help him get rid of the guns. Mr. Morris took the petitioner and Mr. Robinson to Coro Lake, and they threw the guns into the lake. When Mr. Morris was eventually taken into custody, he showed police where the guns were thrown and the field where the jug was thrown.

Mr. Morris admitted that he had been charged as an accessory after the fact to murder because he helped to dispose of the evidence and stole the VCR. He testified that no promises had been made to him for his testimony and that he had been asked by the State only to tell the truth.

On cross-examination, Mr. Morris explained that the apartment was in the name of the petitioner and Mr. Robinson and that he was only sleeping on the floor in the living room. He insisted he had no idea why Mr. Saulsberry wanted him to drive to the Club on the Green that evening.

Mr. Morris testified that the petitioner did not hesitate to jump out and shoot the victim again when Mr. Robinson told him to. He stated that the next morning Mr. Saulsberry called his girlfriend and that she came to meet him. Later that day, Mr. Saulsberry went to the hospital for treatment of the burns. Following Mr. Saulsberry's hospital visit, the police questioned the petitioner and Mr. Robinson about Mr. Saulsberry's burns.

Mr. Morris was cross-examined extensively regarding his earlier testimony at a preliminary hearing in general sessions court. He was asked if he had previously testified that Mr. Robinson was waving a gun around, pointing it at the petitioner, and ordering him to get out of the van and shoot the victim. Mr. Morris stated that he could not recall if that was how the events took place or if that was how he had previously testified.

On redirect, Mr. Morris said that he knew Mr. Robinson was "gonna rob someone" that evening from a conversation he had with him, Ms. Brown, and the petitioner earlier in the day. He testified that when the Blazer showed up, he knew it wasn't Mr. Robinson's. Mr. Morris saw the blood in the car but didn't ask anything about it.

On recross, Mr. Morris confirmed that he heard Mr. Robinson tell him, the petitioner, and Ms. Brown about a plan to rob someone. He testified that the conversation took place on the porch earlier in the afternoon of April 10, 2001.

On further redirect examination, Mr. Morris confirmed that Mr. Robinson was talking

with the petitioner and Ms. Brown about using Ms. Brown as "bait" in a robbery. Mr. Robinson then told him that "he wanted me to drop him off at Club on the Green that night." Mr. Morris stated that the conversation about using Ms. Morris as "bait" did not take place on the porch. He testified that there was a second conversation about the robbery later that evening in Mr. Robinson's room.

On further recross examination, Mr. Morris was confronted by lead counsel about the way his story was changing. At one point he claimed not to hear any details of the upstairs conversation by the petitioner, Mr. Robinson, and Ms. Brown regarding the use of "bait." He had not previously disclosed the conversation on the porch. Mr. Morris denied changing his story to lighten his own culpability. He denied making up the conversations.

On further redirect examination Mr. Morris was questioned about a statement he gave to the police on April 26, 2001. Mr. Morris testified that the statement includes information about the plan to lure the victim and rob him. The statement was included as evidence of a prior consistent statement.

Lieutenant Vennes Owens with the Memphis Police Department testified that he was assisting in the victim's case on May 1, 2001, when a suspect, Mr. Morris, was brought in for questioning. After the questioning, Mr. Morris led Lieutenant Owens to an area near Coro Lake and Robco Lake to help locate the pistols that had been used in the murder. Divers searched the area Mr. Morris directed them to and found the pistols "pretty quickly" with his directions. Mr. Morris also led Lieutenant Owens and Lieutenant Anthony Craig to an area near the Loft Apartments where police found a plastic milk jug that had been used to carry gasoline.

Lieutenant Reginald Morgan with the Memphis Police Department testified that he was the lead investigator in the case. On April 18, 2001, Lieutenant Morgan accompanied Sergeant Jones to the Club on the Green Apartments where the victim's vehicle was found. The vehicle had been burned from the inside out. On October 4, 2001, Lieutenant Morgan retrieved a "bullet pack" from the morgue containing bullets which had been retrieved from the victim's body. He then took the bullets and the pistols recovered from the lake to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing.

Don Carman, a forensic scientist with the firearms identification unit of the TBI crime laboratory, testified that he received the two .380 caliber pistols that police found in the lake, the five bullets retrieved from the victim's body, and the eight cartridge casings found at the scene of the crime. One of the pistols was a Lorson .380 caliber semi-automatic which was missing the left thumb safety, and the other was a Davis .380 caliber automatic. The Lorson was larger than the Davis. Agent Carman testified that when he received the pistols, the barrels and chambers were impacted with mud and rust, and the pistols were inoperable. Agent Carman cleaned the pistols and performed tests on them and on the bullets and cartridges.

Agent Carman determined that bullets A and B had been fired from the same pistol. [3] He stated that the bullets demonstrated the same class characteristics as a bullet fired from the Lorson pistol, but that he could not make an absolutely positive identification. Agent Carman determined that bullets C and D were fired from the same pistol, a pistol with Davis characteristics but that, again, he was unable to make a conclusive identification. Agent Carman said that the fifth bullet was a .380 caliber; however, the bullet was too mutilated for a comparison to be conducted. Agent Carman said that two of the cartridges were similar to each other and to the class characteristics of the Davis pistol. Two other cartridges were similar to each other and similar to characteristics of the Davis. The remaining four cartridges were similar to each other, but Agent Carman could not determine the origin of those cartridges. Agent Carman explained that the mud and rust in the pistols contributed to the difficulty in establishing a conclusive match between the pistols and the bullets or cartridges.

James Michael Ryall with the Memphis Police Department testified that he assisted in Lieutenant Morgan's investigation of the murder and robbery of O'Neil Cornish. He stated that on April 27, 2001, he interviewed the petitioner along with Lieutenant Morgan at the homicide office interview room. He testified that the petitioner was advised of his rights before questioning. Officer Ryall testified that the petitioner was fully cooperative and never asked him to stop the questioning or for an attorney. The petitioner received a chance to go over his statement to make any corrections he deemed necessary. Each page and correction was initialed by the petitioner. The statement detailed the petitioner's involvement in the robbery and murder of the victim, including the petitioner's firing four bullets into the victim when they returned to the body a second time.

On cross examination, Officer Ryall testified that the petitioner made his statement while he was in custody from 8:49 pm to 1:43 am. He testified that the petitioner could take breaks whenever he wanted. Officer Ryall stated that although the petitioner seemed tired by the end of the evening, "we all were," and the petitioner was still able to answer all the questions "properly and adequately, he did a great job."

Based upon the foregoing, the jury convicted the petitioner of felony murder, *see* T.C.A. § 39-13-202, and especially aggravated robbery, see *id.* § 39-13-403. The petitioner was acquitted on the charge of premeditated first degree murder. In exchange for waiving his right to appeal the jury verdict, the petitioner received a sentence of life in prison with the possibility of parole for the felony murder conviction and twenty-five years for the especially aggravated robbery conviction, to be served concurrently.

On January 26, 2004, the petitioner filed a pro-se petition for post-conviction relief. After appointment of counsel, the petitioner filed amended petitions on November 12, 2004, and March 6, 2006. An evidentiary hearing was held on March 6-7, 2006 in the Criminal Court for Shelby County.

---

[3] The bullet designation coincides with the corresponding gunshot wound designation. For instance, bullet A caused gunshot wound A.

The first witness called at the post-conviction hearing was the petitioner's lead counsel at the jury trial. Lead counsel testified that he was part of the public defender's capital defense team and that he represented the petitioner from the preliminary hearing forward. He testified that he and members of the team met with the petitioner in prison "several times."

Lead counsel testified that he emphasized at trial that the petitioner "was forced or coerced into actually firing shots into the body of the person that was already murdered and that was one of the things that we harped on and we played on, that the murder had already been committed." Lead counsel said he believed the only crime the petitioner was guilty of was abuse of a corpse. However, lead counsel stressed that the fact the petitioner did not remove himself from the situation made the defense of duress unlikely to succeed:

> Not only did he go back to the apartment where they lived . . . [t]hey went to a service station. They bought gasoline. They came back, tried to burn the van up. Then they go back to the apartment. They live there for a couple more days together. The police come out. They give statements that's [sic] totally bogus, I should say, and they even went with them to dispose of the guns, went out to Coral Lake or some place. There was too many factors after the murder that he never should have gotten involved in. He didn't step aside once it happened and I think that's what the jury saw, what they thought.

On cross examination, lead counsel said the petitioner had maintained that he went along with Ms. Brown and Mr. Robinson to spy on his brother's girlfriend. "That's what he told me at the outset. That was what his version of it was. That's what he told me." Lead counsel testified that the petitioner's police statement supported the defense theory that although the petitioner took part in the planning of the robbery, he did not expect the event to actually occur. When questioned more about the theory of duress, lead counsel admitted he argued the petitioner was forced to participate. However, "[w]hat overshadowed the duress was the continued involvement by Mr. Perry with the individuals for some period of time after the threatening event had actually taken place." The continued involvement after the crime combined with the police statement "just pushed our little duress theory just out the window."

Lead counsel testified, "I think that everybody that was involved in this case was afraid of Mr. Robinson because Mr. Robinson was kind of way out in left field. He was capable of doing anything." He did not recall any documents in the homicide bureau criminal investigation report vocalizing these fears. Lead counsel did not recall anything in the petitioner's police statement about being forced into participating. He testified that he was troubled by the fact there were corrections and additions, which is a sign the petitioner was not being coerced into making a statement.

The petitioner testified that the did not take the stand at trial because lead counsel told him the prosecution would just "tear you apart" because he did not have a defense for his actions.

He testified that he believed if lead counsel had questioned him and questioned certain witnesses about their prior statements, they could have supported the duress claim. He claimed that Corey Perry and Terrance Scott, if called to testify, could have shown that the petitioner did not need to rob anyone and was not worried about being kicked out of the apartment. The petitioner testified that the duress theory would have been supported by a mental examination "to find out, you know, the mental state that I was in at the time I was, like, forced to being involved in it."

The petitioner testified that Mr. Robinson told him he was going to kill the victim but that the petitioner did not believe him. He testified that Mr. Robinson threatened him not to talk, saying he would have to "knock you off because I can't go to jail for this." The petitioner was placed into protective custody when he was incarcerated, but his police statement did not mention Mr. Robinson's threats because "they didn't tell me, Mr. Perry, you absolutely have to . . . put everything in this statement."

On cross examination, the petitioner admitted it was ultimately his decision whether or not he would take the stand in his own defense.

Takisha Brown testified that she was present for the murder. She admitted she had been convicted of the charge of facilitation as a result of the murder. She also admitted that on the evening of the murder she had been at the movies with a second man with whom she was romantically involved before returning to the Loft Apartments. She testified that she felt "a little" threatened by Mr. Robinson after the murder.

On August 4, 2006, the post-conviction court entered an order denying the petition, holding that "[b]ased on all the evidence adduced at the hearing there was no basis to support the defendant's claim of ineffective assistance of counsel."

The petitioner filed a timely notice of appeal on August 30, 2006. On appeal, he argues that lead counsel failed to raise a proper defense of duress and failed to address why the petitioner was present at the murder scene.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

The Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975). "Claims of ineffective assistance of counsel are considered mixed questions of

law and fact and are subject to de novo review." *Serrano v. State*, 133 S.W.3d 599, 603 (Tenn. 2004); *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)  When a defendant claims ineffective assistance of counsel, the court must determine (1) whether counsel's performance was within the range of competence demanded of attorneys in criminal cases, *Baxter*, 523 S.W.2d at 936, and (2) whether any deficient performance prejudiced the petitioner, *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984); *see also Powers v. State*, 942 S.W.2d 551, 557 (Tenn. Crim. App. 1996).  Courts need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one.  *Henley*, 960 S.W.2d at 580.

A reviewing court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance.  *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2070.  This court should not second-guess informed tactical and strategic decisions by defense counsel. *Henley*, 960 S.W.2d at 579. It must evaluate counsel's performance from counsel's perspective at the time of the alleged error and in light of the totality of the evidence. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2070.

However, this court's deference to counsel's tactical decisions will depend upon counsel's adequate investigation of defense options.  *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987).  Assuming adequate investigation, the fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. *Thompson v. State*, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997); *Jerry Whiteside Dickerson v. State*, No. 03C01-9710-CR-00472, slip op. at 3 (Tenn. Crim. App., Knoxville, Sept. 16, 1998).

In sum, a defendant is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996).  To show prejudice, the petitioner must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

Our analysis of the issues on appeal need not be protracted.  The record supports the post-conviction court's determination that the petitioner failed to establish his claims of ineffective assistance of counsel by clear and convincing evidence, and we agree that the petitioner's evidence in the evidentiary hearing was neither clear nor convincing.  The claim that counsel failed to properly raise a defense of duress was dissipated not only by counsel's testimony that there were "too many factors after the murder that he never should have gotten involved in," but also the finding by the post-conviction court that there was no basis to support any claim of ineffective assistance of counsel, including the duress defense.  Furthermore, statements by Mr. Morris, Ms. Brown, and the petitioner's own confession support the willing participation of the petitioner.  Thus, the petitioner failed to establish prejudice with respect to trial counsel's failure to establish a defense of duress.

Additionally, we fail to see any prejudice with respect to trial counsel failing to address why the petitioner was at the murder scene.  The petitioner's confession showed that he had

-11-

knowledge of Mr. Robinson's plan to rob and kill the victim. Despite knowledge of what would be taking place the petitioner not only chose to accompany Mr. Robinson for the original murder and robbery, but he also returned to the scene, shot the victim again, destroyed evidence, and participated in a cover-up of the crime. The weight of the evidence in support of the petitioner's willing participation of the crime was overwhelming. The petitioner failed to establish prejudice with respect to trial counsel's failure to explain his presence at the scene.

In conclusion, having reviewed the petitioner's claims for post-conviction relief and holding that the record supports the post-conviction court's denial of his claims, we affirm the judgment of the post-conviction court.

_____

JAMES CURWOOD WITT JR., JUDGE